## UNITED STATES v. LITTLE.
### No. 7352.

Circuit Court of Appeals, Fifth Circuit.
April 5, 1935.

Rehearing Denied April 26, 1935.

See, also, (D. C.) 54 F.(2d) 711.

Philip H. Mecom, U. S. Atty., and J. Fair Hardin, Asst. U. S. Atty., both of Shreveport, La., and J. Gregory Bruce, Atty., Department of Justice, of Washington, D. C., for the United States.

J. B. Dawkins, of Monroe, La., and Vernon Bankston, of Hamburg, Ark., for appellee.

Before BRYAN, HUTCHESON, and WALKER, Circuit Judges.

WALKER, Circuit Judge.

This action on a war risk policy was brought in June, 1931, the appellee's petition alleging that he was inducted into the army on May 27, 1918, and served therein until he was honorably discharged therefrom on May 19, 1919; that all premiums on the policy sued on were paid up to and including the month of May, 1919; that while the policy was in force on or about the 18th day of October, 1918, appellee contracted pulmonary tuberculosis, and from that date was totally and permanently disabled from performing any gainful occupation. The last-mentioned allegation was put in issue. Upon the conclusion of the evidence the defendant, appellant here, moved the court for a directed verdict in its favor. The court overruled that motion.

At the time of his discharge from the army appellee signed a written statement that he had no reason to believe that he was then suffering from any disability or impairment of health, and the examining army doctor certified that he was physically and mentally sound. As to his above-mentioned statement, appellee testified that he would have answered any question to get discharged, that if he knew there was anything wrong with him he would get hospital care. Appellee testified that while he was in the army he suffered from pains in his chest, had a cough, and "he spit up blood along," and that when he came home immediately after his discharge he was in a general run-down condition, suffering from his chest and ankles, had fever and coughed a lot; that he was given medicine while in the service, but did not go to a hospital. In making application for compensation in July, 1921, appellee stated nature and extent of disability claimed to be "weakness of limbs, failing eye-sight, shortness of breath, severe," and that he first noticed the disability in the winter of 1919–1920. Roy Pruett testified that he was acquainted with the appellee before he entered the army and was in the same company with him in France; that in November, 1918, just before the Armistice, appellee got a pain something like flu, coughed a heap, complained of his breast, and that his lungs hurt him and would cough up kind of bloody stuff; that after the Armistice appellee was not able to do duty and was marked "Quarters," which meant impossible to be on duty; that at the time appellee was discharged he was still complaining, his condition then, compared with the time he spit up blood, was practically the same. Two physicians, Dr. Chavis and Dr. Kellum, as witnesses for the appellee, testified from memory as to examinations of appellee made in June and July, 1919. Dr. Chavis stated: "The findings I think was T. B. when I first examined him. * * * I found him suffering from pulmonary tuberculosis. It was active because he had temperature. He had moist rales, was losing weight and was weak * * * I never made any sputum test and I cannot tell you about the germs but I did use a stethoscope * * * I didn't make any record * * * Coughing might mean something and it might not. The spitting up of blood may come from various things besides tuberculosis. * * * I told him to quit work and go to bed; I think any work he did in that condition at that time was detrimental to his health and aggravative of the disease. If he did any work it was against my advice." Dr. Kellum stated: "I knew Fabe Little and have examined him since May 21, 1919. I assisted in the examination in June, 1919, with Dr. Sessler of Crossett and found on examination that he had tuberculosis in an acute state * * * The examination was made in Dr. Sessler's office. I happened to be at Crossett in Dr. Sessler's office when the patient came in. I determined that he was suffering from acute tuberculosis by his running a slight temperature and coughing and spitting blood occasionally. I examined his sputum through a microscope and found active bacilli. * * * The examination lasted just a few minutes and I did not have occasion after that until last year to refresh my mind upon it." Dr. E. L. Miller, a witness for the appellee, stated that

he examined appellee in the spring of 1925 and found temperature, cough, and rales, and arrived at a diagnosis that he had active pulmonary tuberculosis. The witness stated: "He heard the testimony of Mr. Little, his wife and Mr. Pruett. Assuming their statements as truth and taking into consideration the findings that my examination and the history he gave me, I would say that in May, 1919, when he came from the Army he had tuberculosis at that time. Taking into consideration his condition at that time it is my professional opinion that he could not, without detriment to his health, carry on some occupation, say hauling of logs or farming, in that condition." In March, 1927, appellee's condition was diagnosed as chronic active tuberculosis, far advanced. A physician, a witness for the appellee, who took part in the examination of appellee for the purpose of testifying in this case, upon being asked if appellee's tuberculosis has been arrested from time to time, or has been continuously active, stated: "As to the definite period I could not say. But whether or not there has been active tuberculosis over a period of fifteen years is hardly possible. A man could not live that long with an active tuberculosis, continuously active, because it would sap his strength in that length of time. There surely must have been at some time or other some arrest of its activity." That witness stated: "It would be necessary for a person with an arrested case of tuberculosis to take a more or less greater degree of precaution in order to carry on his occupation. He might carry on provided he took those precautions and got the necessary amount of rest and the work is of a reasonable nature. It is not necessarily true that a person who has had tuberculosis or that even now has tuberculosis, that he will never be able to carry on any kind of occupation. He may be entirely healed under proper care."

From June 10, 1919, to January 1, 1926—except for eleven months in 1921, nine of which he spent on a farm and two of which he spent in a hospital—appellee was in the employ of a logging company and received regular pay for the service. From June 10, 1919, to September 10, 1919, he worked as a teamster for $80 a month. Beginning December 1, 1919, appellee was employed by the Crossett Lumber Company until February 1, 1921. His pay was $75 a month until May 1, 1920, when his pay was in-

creased to $85 a month, and it was again increased to $90 a month. During that period he received full pay except for the second half of December, 1919, when he received approximately one-half pay. From January 1, 1922, until January 1, 1926, appellee was regularly employed by the Crossett Lumber Company, part of the time as a teamster, and part of the time in caring for teams and stable. From March, 1925, until December, 1925, appellee received full pay for every month, and during that time he was paid, in addition to his regular pay, for 363 hours overtime. Appellee stated: "Those times men were very scarce and frequent times, as now and then, a man would get hurt or would get sick, and they would ask one of us barn men to relieve him for the remainder of the day,—a man at work in the woods. Like a man would take sick or get hurt and you see it doesn't require very long to get through with the barn work, and I would say that I spliced in a few days along, and the time I did do that I was paid double." The appellee and several other lay witnesses, including his wife and a brother-in-law, testified that he was not able to do much of the work for which he was paid, and that his wife and coemployees assisted him, doing some of his work for him.

The burden was on the appellee to prove that he became totally and permanently disabled while the policy was in force. The testimony of physicians as to the appellee having pulmonary tuberculosis a short time after his discharge from the army contained nothing indicating that appellee's then existing disabilty was a permanent one. It is plain from the evidence that if appellee had tuberculosis while the policy was in force, the disease then was in its incipient or an early stage. It is a matter of common knowledge that in its early stages tuberculosis is curable or may be arrested. A finding that one was permanently disabled at a given time is not supported by testimony merely to the effect that he had active pulmonary tuberculosis at that time, unaccompanied by evidence that his condition at that time, whether disclosed then or later, was such that the disability resulting from the disease would continue throughout his life. There was no evidence having any tendency to prove that the deposed to pulmonary tuberculosis of the appellee found existing a short time after the lapse of the policy then had progressed

so far as to be incurable, or was founded upon conditions which rendered it reasonably certain to continue to be totally disabling throughout appellee's life. The evidence furnished no basis for a finding that the total permanent disability of the appellee which was clearly disclosed long after the lapse of the policy was due to the natural progress of the pulmonary tuberculosis which started while the policy was in force, rather than to appellee's lack of ordinary prudence in failing to follow the advice of physicians, to his working when he was ordered by his doctor to rest, and to his failure to take treatment which was available to him. There was no substantial evidence tending to prove that a total disability suffered by the appellee while the policy was in force was founded upon conditions which rendered it reasonably certain to continue throughout his life. The state of the evidence was such that such a finding must have been based, not on evidence furnishing any support therefor, but on unwarranted surmise or conjecture. Eggen v. United States (C. C. A.) 58 F. (2d) 616; Wise v. United States (C. C. A.) 63 F.(2d) 307; United States v. Elmore (C. C. A.) 68 F.(2d) 551; United States v. Messinger (C. C. A.) 68 F.(2d) 234, 235; Falbo v. United States (C. C. A.) 64 F.(2d) 948; Id., 291 U. S. 646, 54 S. Ct. 456, 78 L. Ed. 1042.

The facts that throughout several years after the lapse of the policy the appellee, with substantial continuity, followed substantially gainful occupations, getting successive increases in wages, and that no evidence indicated that during a period of more than twelve years immediately following the lapse of the policy the appellee or any other person believed or claimed that he became totally and permanently disabled while the policy was in force, put upon the appellee the burden of producing clear and convincing evidence supporting the claim asserted by the suit. Lumbra v. United States, 290 U. S. 551, 54 S. Ct. 272, 78 L. Ed. 492; United States v. Spaulding, 293 U. S. 498, 55 S. Ct. 273, 79 L. Ed. ——, Jan. 7, 1935; Wise v. United States, supra. Instead of the appellee producing such evidence, he produced no evidence having a substantial tendency to prove that any disability suffered by him while the policy was in force was of a permanent nature. It follows that the above-mentioned ruling was erroneous. The judgment is reversed.